**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **C.L.**, *by and through his parent and natural guardian, K.B.*, | ) |
| | ) |
| | ) |
| **Plaintiffs,** | ) **2:14-cv-1666** |
| | ) |
| **v.** | ) |
| | ) |
| **MARS AREA SCHOOL DISTRICT, ADAM M. KOSTEWICZ, DR. WILLIAM J. PETTIGREW, J. DAYLE FERGUSON, REBECCA BROWN, GORDON MARBURGER, STEVEN B. BOGGS, RITA DORSCH, JANE DUNN, JOHN KENNEDY, CHRISTINE VELENTA and BONNIE L. WEAVER,** | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| **Defendants.** | ) |

## MEMORANDUM OPINION

C.L., by and through his parent and natural guardian, K.B. ("Plaintiffs"), brings this action under the Individuals with Disabilities Education Act ("IDEA"), 42 U.S.C. § 1401 *et seq.*; Section 504 of the Rehabilitation Act of 1973 ("RA"), 29 U.S.C. § 794; the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*; 42 U.S.C. § 1983; and Pennsylvania law. Plaintiffs "seek[] the value of compensatory education, monetary damages, attorney's fees, and other appropriate judicial relief due to the School District's: (1) abject failure to properly initiate, prepare, and implement an Individualized Education Program ('IEP'); (2) refusal to properly evaluate C.L. and provide necessary aides, support and services; (3) protect the bodily integrity of C.L, and (4) wrongful expulsion in violation of the IDEA which was overturned by a Due Process Hearing Officer." Am. Compl. ¶ 1, ECF No. 21. In addition to the Mars Area School District, the Amended Complaint names various School District administrators, employees, and School Board members as Defendants: Adam M. Kostewicz, the principal of the Mars Primary School; Dr. Richard Glosser, the School District's psychologist; Eileen Deklewa, a guidance

counselor in the School District; Dr. William J. Pettigrew, the School District's superintendent; and J. Dayle Ferguson, Rebecca Brown, Gordon Marburger, Steven B. Boggs, Rita Dorsch, Jane Dunn, John Kennedy, Christine Velenta, and Bonnie L. Weaver, each of whom is a member of the School Board (collectively, the "individual Defendants").

Pending before the Court is Defendants' MOTION TO DISMISS AMENDED COMPLAINT IN CIVIL ACTION PURSUANT TO RULE 12(b)(1) AND 12(b)(6), along with a brief in support. ECF Nos. 25, 26. Plaintiffs have filed a brief in opposition to Defendants' motion. ECF No. 28. Accordingly, the motion is ripe for disposition.

## I.    Background

### A.    Facts

When this action was initiated, C.L. was a seven-year-old first grader in the School District. Am. Compl. ¶¶ 20, 59. He suffers from Oppositional Defiance Disorder ("ODD"), Attention Deficit Hyperactivity Disorder ("ADHD"), and craniosynostosis. *Id.* ¶¶ 15-16.

C.L. attended kindergarten at Heart Prints Center for Early Education, where he received wraparound services through a community behavioral health organization. *Id.* ¶¶ 67-68. Such services included a combination of Therapeutic Staff Support ("TSS"), Mobile Therapy ("MT"), and a Behavioral Specialist Consultant ("BSC"). *Id.* ¶ 69. These services enabled C.L. to do "very well" in kindergarten. *Id.* ¶ 70.

C.L. enrolled in the School District after completing kindergarten, and his wraparound services ceased. *Id.* ¶ 71. At the time of C.L.'s enrollment, K.B. informed Kostewitz, the principal, and Deklewa, the guidance counselor, about C.L.'s disabilities and how they would affect his interactions and performance in school. *Id.* ¶ 72. In response, the School officials advised K.B. that C.L. had to "be observed" before an individualized education program ("IEP")

was developed for him. *Id.* ¶ 73. On September 17, 2014, Kostewitz contacted K.B. to report that the School District had been "having issues with C.L.," and a meeting between the School District and K.B. was scheduled to discuss C.L.'s disability and treatment. *Id.* ¶¶ 77-78. C.L.'s BSC and Ellen J. Humitsky of Heart Prints Center were present at the meeting, along with the School District representatives and K.B. *Id.* ¶ 78. At the meeting, the School District recommended that C.L. be placed immediately in an alternative schooling program. *Id.* ¶ 79. K.B. refused, and instead the School District agreed to begin evaluating C.L. for an IEP. *Id.* ¶ 63; Hr'g Officer's Decision ¶ 9, ECF No. 21-2. Plaintiffs allege, however, that the School District delayed C.L.'s evaluation to prevent the development and implementation of the IEP. Am. Compl. ¶ 64.

On September 18, 2014, C.L. was suspended for throwing a shoe and was held out of class without a tutor until September 21, 2014. *Id.* ¶¶ 81-83. Plaintiffs claim that C.L.'s suspension was unlawful because the conduct giving rise to the suspension was a manifestation of C.L.'s disabilities. *Id.* ¶ 82. They also claim that K.B. was not provided with written notice of the suspension. *Id.* ¶ 83. On September 30, 2014, C.L. was suspended, again allegedly without written notice or cause. *Id.* ¶ 84. The principal also allegedly grabbed C.L. by the arm and dragged him down the hall in front of his classmates, causing him fear and humiliation. *Id.* ¶ 85. According to Plaintiffs, this "was done for the purpose of ostracizing C.L. from his classmates, thereby preventing his integration into the classroom environment." *Id.* ¶ 87. Furthermore, Plaintiffs allege, "[t]he physical attack and refusal to help C.L. with his disability was part of a pattern and practice by the School District to prevent C.L. from integrating with the other non-disabled first grade children and terrify and humiliate C.L. to the point he does not want to return to school." *Id.* ¶ 88. The principal allegedly pulled C.L.'s arm on other occasions, and as a result,

C.L. now experiences anxiety, nightmares, difficulty sleeping, and is withdrawn from the classroom environment. *Id.* ¶ 90.

On October 6, 2014, the School District assigned an aide to work with C.L., but the aide was allegedly "untrained in the area of behavioral treatment and completely unable to perform any appropriate behavioral intervention and modification." *Id.* ¶ 91. According to the Amended Complaint, the School District intentionally assigned the inexperienced aide to try to make C.L. to act out, which would in turn allow the School District to move C.L. to an off-site educational environment. *Id.* ¶ 92.

On October 10, 2014, the School District moved C.L.'s desk away from the desks of his classmates "to exclude [him] from any reasonable class interaction and humiliate him as a result of his disability." *Id.* ¶ 93. That same day, the principal grabbed C.L. forcibly by the shoulders and pressed down on his torso, causing him pain and discomfort and frightening him to the extent that he "does not want to re-enter the primary school." *Id.* ¶ 97. The principal then paraded C.L. in front of his classmates with a police escort as the students lined up for the buses at the end of the day. *Id.* ¶ 101.

Plaintiffs further allege that the School District placed C.L. in a "safe room" on unspecified occasions, where he was locked away for in excess of three hours at a time without a tutor or other adult supervision. *Id.* ¶ 95. The School District also allegedly promoted and facilitated the harassment of C.L. by other students, with the intent to cause C.L. to act out, which would give the School District an ostensible basis for removing C.L. from the regular school setting. *Id.* ¶ 115. Also, on unspecified occasions, C.L. was forced to eat lunch by himself away from other students. *Id.* ¶ 93.

Sometime in late September or early October 2014, K.B. filed a due process complaint

related to C.L.'s suspensions.[1] On October 20, 2014, after learning of the due process complaint, the School District allegedly suspended C.L. again, and the Adams Township Police Department was apparently called in relation to the incident leading to his suspension. *Id.* ¶¶ 101-04. On October 22, 2014, the School District attempted to avoid participation in an inter-agency service planning team ("ISPT") meeting, allegedly to prevent C.L. from receiving wraparound services. *Id.* ¶ 105. According to Plaintiffs, this was "part of the School District's systemic plan and scheme to place C.L. in a restrictive off-site placement." *Id.* ¶ 106.

On October 27, 2014, the School District alleged that C.L. pushed a student, kicked a teacher, and overturned tables in a classroom, and the next day, the School District decided to initiate expulsion proceedings against C.L. *Id.* ¶¶ 117-18. K.B., however, claimed that C.L.'s conduct was a manifestation of his disability. *Id.* ¶ 117. In addition, according to the Amended Complaint, the allegation that C.L. kicked a teacher was a fabrication. *Id.* ¶ 119. Because C.L.'s IDEA evaluation was underway, the School District held a manifestation determination review before proceeding with the expulsion.[2] At the review, the School District's IEP team allegedly

---

1.      The Amended Complaint does not specify when this due process complaint was filed, what issues it raised, or whether it was ever resolved. The hearing officer's decision, however, indicates that "[d]uring [the period between September 18 and October 21, 2014,] Parents filed a due process complaint to preclude the District from continuing to suspend Student from school due to behaviors that Parents contended were due to Student's ODD and ADHD diagnoses." Hr'g Officer's Decision ¶ 17. The Court notes that it may consider the hearing officer's decision when deciding the pending motion. *Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1385 n.2 (3d Cir. 1994).

2.      Under the IDEA, "within 10 school days of any decision to change the placement of a child with a disability because of a violation of a code of student conduct," a school must "review all relevant information in the student's file, including the child's IEP, any teacher observations, and any relevant information provided by the parents to determine . . . if the conduct in question was caused by, or had a direct and substantial relationship to, the child's disability; or . . . if the conduct in question was the direct result of the local educational agency's failure to implement the IEP." 20 U.S.C. § 1415(k)(1)(E)(i)(I)-(II). If so, the IEP team must "conduct a functional behavioral assessment, and implement a behavioral intervention plan,"

"rubber stamped" a previous determination by the School District that C.L.'s conduct on October 27, 2014, was not a manifestation of his ADHD and ODD. *Id.* ¶ 121. According to Plaintiffs, The IEP team did not consult an independent psychologist before makings its manifestation determination. *Id.* ¶ 121. Furthermore, the School District disregarded the testimony of a psychologist retained by K.B., who opined that the conduct at issue was a manifestation of C.L.'s disabilities. *Id.* ¶ 123.

Immediately following the manifestation determination review, the School District began an expulsion hearing, which, in Plaintiffs' words, was tantamount to a "kangaroo court." *Id.* ¶¶ 121, 124, 125. In support of that description, Plaintiffs point to a number of procedural errors that allegedly occurred at the hearing: the School District's attorney acted as both the hearing officer and counsel for the School District; notice was not provided in accordance with the requirements of 22 Pa. Code § 12.8(b)(1); the School District violated the "stay put" provision in the IDEA by not allowing C.L. to return to school pending the outcome of the proceedings; an evaluation report was not completed prior to the manifestation determination; K.B. was never provided with a copy of the School District's expulsion policy; the School District's policies and procedures were never provided to K.B.; the complaint against C.L. was not sufficiently detailed; an informal hearing was not conducted, as required by School District policy; C.L.'s suspensions were not initiated with the requisite written notice; the hearing officer permitted references to

---

unless one had already be conducted, in which case the IEP team must review and modify the existing plan. *Id.* § 1415(k)(1)(F)(i)-(ii). Meanwhile, the child must be returned to the placement from which he was removed, unless the parents and the school agree to a change of placement. *Id.* § 1415(k)(1)(F)(iii). If the parent of a disabled child disagrees with the manifestation determination, the parent may request an expedited hearing. *Id.* §§1415(k)(3)(A), 1415(k)(4)(B). If the hearing officer finds for the parent, she "may (I) return a child with a disability to the placement from which the child was removed; or (II) order a change in placement of a child with a disability to an appropriate interim alternative educational setting for not more than 45 school days . . . ." *Id.* § 1415(k)(3)(B)(ii).

C.L.'s prior suspensions, even though no manifestation determination review was conducted for these suspensions; a formal decision was never rendered; and notice of C.L.'s right to appeal the results of the hearing was not provided. *Id.* ¶ 126. At the conclusion of the hearing, the School Board members recommended that C.L. should be expelled.[3] *Id.* ¶ 128. According to the Amended Complaint, however, KB was not notified that the School Board had approved the expulsion, as is required by Pennsylvania law. *Id.* ¶ 132. Furthermore, Plaintiffs allege that no other first grader in the School District has ever been suspended or expelled for pushing a child or flipping a chair – the conduct that triggered C.L.'s expulsion. *Id.* ¶ 130.

The School District's IDEA evaluation report had not been completed prior to the manifestation determination review and expulsion hearing. The report was, however, completed sometime prior to November 11, 2014. *Id.* ¶ 137. In the report, Glosser, Adams, and Deklewa indicated that C.L.'s disruptive behaviors – being argumentative, defying requests, possessing poor control of emotional responses, breaking rules, having destructive tendencies, and being manipulative – were a manifestation of his disabilities. *Id.* ¶ 138. Despite what they had

---

3.    The hearing officer explained in her decision that a committee of the Board heard the evidence and then recommended C.L.'s expulsion to the full Board, with the following additional recommendations:

> 1) Direct the Special Education Department to identify an appropriate placement outside the District that will meet Student's needs; 2) direct the District's ER be completed as soon as possible, and if Student is determined to be IDEA eligible, the IEP team should develop and implement an appropriate IEP and behavior support plan based upon an FBA; 3) if Student makes progress on the IEP, Student's IEP team may recommend Student's return to the District at the beginning of, or any time after, the second semester of the current school year; 4) if return to the District is recommended, the IEP team should develop an appropriate transition plan.

Hr'g Officer's Decision ¶ 34. According to the hearing officer, "the expulsion recommendation is consistent with the change of placement to an alternative setting that the District has consistently offered and recommended for Student since the beginning of the current school year." *Id.* ¶ 35.

concluded in the report, however, Glosser, Kostewicz, and Deklewa testified during the expulsion proceedings that C.L.'s actions on October 27, 2014, were *not* a manifestation of his disabilities. *Id.* ¶ 140.

## B.  The Administrative Process

K.B. appealed the School Board's manifestation determination, and an expedited due process hearing was held before Pennsylvania Special Education Hearing Officer Anne Carroll, Esq., on November 10, 2014.[4] *Id.* ¶¶ 143-44. The two issues before the hearing officer were:

1.  Did the School District accurately and appropriately determine that behaviors in which Student engaged on October 27, 2014 were not a manifestation of Student's disability?

2.  Was the District, therefore, justified in imposing the same discipline it would have imposed on a non-IDEA eligible student for a serious violation of the District's code of student conduct, *i.e.*, Student's expulsion from the District for the 2014/2015 school year?

Hr'g Officer's Decision 3. The hearing officer issued her decision on November 24, 2012, and concluded that the School District's manifestation determination was "clearly erroneous" since there was a "direct and substantial relationship" between C.L.'s disabilities and his conduct on October 27, 2014. *Id.* at 19. In addition, the hearing officer found that the School District had "blatantly violated IDEA placement and discipline procedures." *Id.* at 18. As she explained:

> . . . the District's approach to the manifestation determination review and its unreasonable determination that the same behaviors that support the conclusion that Student has an IDEA disability, and by reason thereof, needs specially designed instruction, were not a manifestation of disability on one particular day, leads directly to the inference that the District was determined to effect a change of Student's educational placement. Notably, District counsel elicited testimony from the school counselor that from nearly the beginning of the current school year, the District had proposed the same alternative placement for student that

---

4.  The School District's evaluation to determine C.L.'s IDEA eligibility had not been completed by the date of the due process hearing, but the School District nevertheless agreed to consider C.L. a child 'thought to be eligible for special-education services.'" Hr'g Officer's Decision ¶ 1. Therefore, C.L.'s IDEA eligibility was not at issue.

was included in the expulsion recommended to the School Board. (FF 34, 35, 36)

> Obviously, Parents were unwilling to agree to the change of placement that the District wanted. Instead of following IDEA procedures to change student's placement, which might have been accomplished by proceeding with the evaluation, followed by the development of an IEP and a recommended placement – including an out of District placement [–] and submitting a due process complaint when/if Parents rejected the recommendation, the District clearly attempted to circumvent the IDEA statutory scheme via expulsion proceedings. By proceeding with a change of educational placement via expulsion proceedings, the District did not need to obtain Parents' consent, and would have remained entirely in control of when and whether Student returned to a District placement during the current school year, without having to consider and abide by the pendent placement ("stay put") requirements.

*Id.*

The hearing officer ordered the School District to rescind C.L.'s expulsion and reinstate him to the educational setting from which he was removed. *Id.* at 19. The hearing officer further ordered the School District to "convene Student's IEP team to consider the results of the District's [evaluation report] and develop an appropriate IEP, including a comprehensive behavior support plan, and recommend an appropriate educational placement for Student." *Id.* In addition, the hearing officer ordered that the School District's "regular education setting shall remain Student's pendent educational placement until . . . Student's IEP team recommends, and Parents sign a NOREP agreeing, to a change of educational placement." *Id.* at 20. The School District filed an appeal of the hearing officer's decision. That matter is pending before this Court at 2:14-cv-01728-TFM.

K.B. has since unilaterally placed C.L. in a private school. Am. Compl. ¶ 152. He allegedly continues to display psychological effects from the treatment he received while enrolled in the Mars School District. *Id.* ¶ 153.

### C. Procedural History

K.B. initiated this action on behalf of C.L. on December 10, 2014, by filing a 16-count

Complaint against the School District, Kostewicz, Pettigrew, and the School Board members. ECF No. 1. On February 10, 2015, Defendants filed a motion to dismiss. ECF No. 16. In lieu of responding, K.B. filed an Amended Complaint. ECF No. 21. The Amended Complaint largely repeats the allegations in the original Complaint, but adds Deklewa and Adams as Defendants and asserts several counts that were not initially pled.

In Counts I through IX, Plaintiffs assert various federal law claims: Count I, violation of the IDEA; Counts II and III, discrimination claims under Section 504 of the RA and the ADA; Counts IV and V, retaliation claims under Section 504 of the RA and the ADA; Counts VI and VII, hostile learning environment claims under Section 504 of the RA and the ADA; and Counts XIII and IX, claims under Section 1983. These claims are asserted against all of the Defendants. In the *ad damnum* clauses following each Count, Plaintiffs request compensatory damages, punitive damages, payment of future private school education, and attorney's fees and costs.

In Counts X through XX, Plaintiffs assert a myriad of state law claims: wrongful expulsion against all Defendants; assault and battery against all Defendants; intentional infliction of emotional distress against all Defendants; false imprisonment against all Defendants; breach of fiduciary duty against Glosser; breach of fiduciary duty against Kostwicz; fraudulent misrepresentation, concealment and nondisclosure against all Defendants; violation of the Professional Psychologists Practice Act against Glosser; negligent hiring, supervision and retention of Kostewicz against all Defendants (including, curiously, Kostewitz himself); vicarious liability; and civil conspiracy. In Counts XXI and XXII, Plaintiffs set forth requests for punitive damages and attorney's fees.

On May 1, 2015, Defendants moved to dismiss under Fed. R. Civ. P. 12(b)(1) and Fed. R. Civ. P. 12(b)(6). They seek dismissal of the entire Amended Complaint for failure to exhaust

administrative remedies. Alternatively, the individual Defendants contend that the claims against them should be dismissed because they are duplicative of the claims against the School District and also because they are entitled to qualified immunity.

## II. Discussion

### A. Federal Law Claims

Although Defendants advance three separate arguments in support of their motion to dismiss Plaintiffs' federal law claims, their chief contention is that this Court lacks subject matter jurisdiction over Plaintiffs' claims under the IDEA, § 504 of the RA, the ADA, and § 1983 because they failed to exhaust the IDEA's administrative process.[5] "Where a claim falls within

---

[5] The Court cannot help but note that large portions of Defendants' argument on this issue have been lifted verbatim – without any attribution whatsoever – from the Middle District's opinion in *Swope v. Central York School District*, 796 F. Supp. 2d 592 (M.D. Pa. 2011). *See* Defs.' Br. 8-9 ("A motion to dismiss under Rule 12(b)(1) . . . *M.M. v. Tredyffrin/Easttown Sch. Dist., 2006 WL 2561242, at 7-8, 2006 U.S. Dist. LEXIS 62818, at 23 (E.D. Pa. Sept. 1, 2006) (same).*"); 13-15 ("The IDEA empowers district courts . . . for lack of subject matter jurisdiction."). Astonishingly, Defendants' counsel did not even attempt to conceal this conduct by removing the *Swope* court's self-referential language. *Id.* at 14 ("The court could stop there . . . . For the sake of thoroughness, the court notes . . . Thus, the court finds . . . ."). Another paragraph is copied and pasted directly from the Eastern District's opinion in *Batchelor v. Rose Tree Media School District*, No. CIV.A. 11-6733, 2013 WL 1776076, at *8 (E.D. Pa. Mar. 28, 2013), *aff'd*, 759 F.3d 266 (3d Cir. 2014) – again, without any attribution. Defs.' Br. at 15 ("What these decisions have in common . . . .").

This is plagiarism, and it is unacceptable. "Although reliance upon precedent forms the bedrock of legal argument, 'citation to authority is *absolutely required* when language is borrowed.'" *Venesevich v. Leonard*, 1:07-cv-2118, 2008 WL 5340162, at *2 n.2 (M.D. Pa. Dec. 19, 2008) (quoting *United States v. Bowen*, 194 F. App'x 393, 402 n.3 (6th Cir. 2006)) (emphasis added). Indeed, some courts have found that "plagiarism violates the prohibition that state ethics codes place on misrepresentation and deceit." *Id.* Our Court of Appeals has not gone that far, but it has remarked that it is "certainly misleading . . . to quote at length a judicial opinion (or, for that matter, any source) without clear attribution." *United States v. Lavanture*, 74 F. App'x 221, 223 n.2 (3d Cir. 2003). This Court will join the Court of Appeals in expressing its "strong disfavor" for this type of conduct. *Id.* Not only is it potentially unethical, but an attorney does not do his client or the Court any favors by cribbing material from a judicial opinion without adding any additional analysis. Defendants' brief exemplifies why: it is a hard-to-follow mishmash of disjointed paragraphs that do not clearly and specifically address or analyze the unique circumstances of this case. Worse yet, when an attorney resorts to plagiarism, his credibility is

the IDEA's ambit (including claims under other federal statutes), a party fails to utilize the IDEA administrative process, and no exception applies, a court must dismiss the claims for lack of subject matter jurisdiction." *M.C. ex rel. R.C. v. Perkiomen Valley Sch. Dist.*, No. CIV.A. 14-5707, 2015 WL 2231915, at *4 (E.D. Pa. May 11, 2015). Accordingly, the Court will address these issues *seriatim* to determine whether the Amended Complaint is subject to dismissal.

### 1.    The IDEA's Statutory Scheme

The IDEA was enacted to "ensure that all children with disabilities have available to them a free appropriate public education [("FAPE")] that emphasizes special education and related services designed to meet their unique needs. . . ." 20 U.S.C. § 1400(d)(1)(A). The statute stresses that parents and schools must work together to achieve that goal. *M.R. v. Ridley Sch. Dist.*, 744 F.3d 112, 117 (3d Cir. 2014) (internal citations omitted). To that end, Congress conditioned the receipt of federal funding on the states' compliance with a number of requirements designed to safeguard "the rights of students with disabilities and their parents." *Batchelor v. Rose Tree Media Sch. Dist.*, 759 F.3d 266, 271 (3d Cir. 2014). Chief among these requirements, schools must identify and evaluate children to determine whether they are IDEA eligible and, if so, develop an appropriate IEP for them. 20 U.S.C. §§ 1412(a)(3),1414(d). "[A]t a minimum, '[t]he IEP must be reasonably calculated to enable the child to receive meaningful educational benefits in light of the student's intellectual potential.'" *Batchelor*, 759 F.3d at 271 n.7 (quoting *Shore Reg'l High Sch. Bd. of Educ. v. P.S.*, 381 F.3d 194, 198 (3d Cir. 2004)).

If, at any time in this process, a child's parent believes that a school has not fulfilled its obligations under the IDEA, the parent can file a complaint and request an impartial due process

___

diminished in the eyes of the Court. Ultimately, this Court's decision has not been affected by the unprofessional submission of Defendants' counsel. However, the Court fully expects that counsel will not engage in this type of conduct in the future – particularly in the parallel case pending at 2:14-cv-01728-TFM.

hearing, conducted in accordance with state law. 20 U.S.C. §§ 1415(b)(6)(A), 1415(f)(1)(A). Following the hearing, "[a]ny party aggrieved by the findings and decision" of the hearing officer can "bring a civil action with respect to the complaint" in federal court. *Id.* § 1415(i)(2)(A). The district court, upon review of the administrative record and hearing any additional evidence submitted by the parties, is empowered to order "such relief as [it] determines is appropriate," *id.* § 1415(i)(2)(C)(i)-(iii), including "'attorneys' fees, reimbursement for private educational placement, and compensatory education.'" *Batchelor*, 759 F.3d at 272 (quoting *Chambers v. Sch. Dist. of Phila. Bd. of Educ.*, 587 F.3d 176, 185 (3d Cir. 2009)).

A party may not, however, bring suit in federal court to vindicate rights secured by the IDEA unless the IDEA's administrative process has been exhausted. *Jeremy H. by Hunter v. Mt. Lebanon Sch. Dist.*, 95 F.3d 272, 281 (3d Cir. 1996). As already noted, this requirement is jurisdictional in nature, such that a party's failure to exhaust will result in dismissal of their complaint without prejudice under Fed. R. Civ. P. 12(b)(1). *Batchelor*, 759 F.3d at 280. The IDEA also provides that:

> Nothing in this chapter shall be construed to restrict or limit the rights, procedures, and remedies available under the Constitution, the Americans with Disabilities Act of 1990, title V of the Rehabilitation Act of 1973, or other Federal laws protecting the rights of children with disabilities, except that *before the filing of a civil action under such laws seeking relief that is also available under this subchapter, the procedures under subsections (f) and (g) shall be exhausted to the same extent as would be required had the action been brought under this subchapter.*

20 U.S.C. § 1415(*l*) (emphasis added). As this provision makes clear, not only is exhaustion required for IDEA claims, but it is "also required in non-IDEA actions where the plaintiff seeks relief that can be obtained under the IDEA." *Batchelor*, 759 F.3d at 272. Consequently, deciding whether exhaustion is necessary "turns on whether the parties could have asserted the claims under the IDEA. Intertwined with this inquiry is whether the claims *could have been remedied*

by the IDEA's administrative process." *Id.* at 273 (emphasis added). As a result, each of the claims asserted by Plaintiffs "require exhaustion . . . if they seek relief that is available under the IDEA," no matter whether they arise under the IDEA or some other statute. *Id.*

## 2. Was exhaustion required?

In Count I, Plaintiffs allege a direct violation of the IDEA, averring that "[t]he School District and School Board willfully, intentionally, and with deliberate indifference delayed any offer of placement for C.L. into an IEP Program." Am. Compl. ¶ 159. Furthermore, Plaintiffs allege, "[t]he School District and School Board willfully, intentionally, and with deliberate indifference refuses [sic] to implement an appropriate program implementing the least restrictive environment requirement of the IDEA."[6] *Id.* ¶ 160. Finally, they allege, "[t]he School District, by and through its agents, physically assaulted and harmed C.L., as well as imprisoned him in a closed room for in excess of three (3) to four (4) hours at a time without any tutor or other adult. This was done for the sole purpose of retaliating against C.L. and his family for attempting to obtain an IEP." *Id.* ¶ 161. And "[a]s a result of the mental, social, emotional, and physical injuries sustained by C.L.," Plaintiffs aver, "he has been prevented from attending school on a regular basis which is the least restrictive environment, and said injuries continue to interfere with his education and social activities." *Id.* ¶ 162. This claim "squarely falls within . . . the IDEA's exhaustion requirement," inasmuch as it arises "under the stricture of the IDEA itself." *Batchelor*, 759 F.3d at 273.

---

6. Under the IDEA, children with disabilities are to be educated with non-disabled children to the maximum extent possible. 20 U.S.C. 1412(a)(5)(A). "Special classes, separate schooling, or other removal of children with disabilities from the regular educational environment [should occur] only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." *Id.* This provision is known as the IDEA's "least restrictive environment" requirement.

The same is true with respect to Plaintiffs' RA and ADA discrimination claims in Counts II and III, which are essentially a repackaging of Plaintiffs' IDEA claim in Count I. *See Jeremy H.*, 95 F.3d at 281 (explaining that Section 1415(*l*) "bars plaintiffs from circumventing [the] IDEA's exhaustion requirement by taking claims that could have been brought under IDEA and repackaging them as claims under some other statute"). In all three Counts, Plaintiffs allege that the School District failed to provide a FAPE to C.L. by failing to timely initiate an IEP and taking discriminatory actions against him.[7] Consequently, these claims are subject to the IDEA's exhaustion requirement. *See A.D. v. Haddon Heights Bd. of Educ.*, No. CIV.A. 14-1880 JBS, 2015 WL 892643, at *12 (D.N.J. Mar. 2, 2015) (citations omitted) (dismissing ADA claim for failure to exhaust where claim was "inextricably linked to the key benefit secured by the IDEA – a free and appropriate public education").

Plaintiffs' retaliation and hostile learning environment claims[8] in Counts IV through VII likewise require exhaustion. In *Batchelor*, the Third Circuit Court of Appeals held that "retaliation claims related to the enforcement of rights under the IDEA must be exhausted before

---

7.    Specifically, in Count II, the RA claim, Plaintiffs allege that "the School District and School Board has discriminated against C.L. who, by reason of his disability, was denied inappropriate [sic] education" when the School District and School Board "[r]efus[ed] to initiate and implement an appropriate program for C.L. in regular school placement;" "[r]efus[ed] to initiate and implement an appropriate program and timely initiate an IEP;" "[e]ngag[ed] in hostile actions to prevent implementation of an IEP, and thereby force[d] C.L. into an off-site restrictive placement;" "[c]reat[ed] a hostile environment at school by intimidating the child and forcing him to act out;" and "[f]abricat[ed] false claims against C.L. and h[eld] an illegal expulsion proceeding." *Id.* ¶ 170(a)-(e). These allegations are repeated nearly word for word in Count III, the ADA claim. *Id.* ¶ 176(a)-(e).

8.    The Court notes that it is not clear "whether hostile learning environment is cognizable" under either the RA or the ADA "in the context of a special education case involving an elementary school student." *Derrick F. v. Red Lion Area Sch. Dist.*, 586 F. Supp. 2d 282, 309 (M.D. Pa. 2008). There is no binding authority in this Circuit recognizing such a claim. However, because Plaintiffs' hostile learning environment claims are virtually indistinguishable from their retaliation claims, and both raise issues that could be remedied by the IDEA, the Court need not address whether the theory is viable. Even if it is, Plaintiffs' claims must be dismissed.

a court may assert subject matter jurisdiction." 759 F.3d at 275. The Court of Appeals anchored its holding in the plain language of the IDEA, which "affords parents of a disabled child the opportunity to present a complaint 'with respect to *any* matter *relating* to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child . . . .'" *Id.* at 274 (quoting 20 U.S.C. § 1415(b)(6)(A)) (emphasis in original). Applying its newly enunciated rule to the facts before it, the Court of Appeals found that the plaintiffs' retaliation claims "palpably 'relate' to the District's provision of a FAPE . . . ." *Id.* In particular, the Court of Appeals noted, the plaintiffs alleged that the school district retaliated against the student by intimidating his mother at meetings, failing to reimburse for the cost of tutors, replacing a tutor with whom the student had worked well with another tutor with whom he did not get along, refusing to implement the terms of the student's IEP, placing the student in a class with a teacher whom he considered a bully, and refusing to permit the student to participate in extracurricular activities. *Id.* They further alleged that the district's conduct "deprived [the student] of a FAPE and caused great harm to his level of educational achievement and personal well being." *Id.* After reviewing these allegations, it was plain to the Court of Appeals that the claims "'relate[d] unmistakably' to the provision of a FAPE to" the student, and thus exhaustion was required. *Id.* (quoting *Rose v. Yeaw*, 214 F.3d 206, 210 (1st Cir. 2000)).

Plaintiffs' RA and ADA retaliation and hostile learning environment claims are not meaningfully distinguishable from the retaliation claims in *Batchelor*. Plaintiffs allege that the School District and the School Board retaliated against C.L. because of his request for an IEP and request for a due process hearing and created a hostile learning environment by "locking C.L. in a closed 'safe room,' alone for a period in excess of three (3) hours;" "[h]aving C.L. escorted by law enforcement officers on the school property in front of his peers;" "[r]equiring

uniformed law enforcement officers to 'parade' C.L. in front of other children in his class;" preventing K.B. "from attending school functions including necessary meetings;" "[h]aving law enforcement officers, in uniform, restrain and drag C.L. through the school hallways in front of other children;" "[d]irecting the Principal to systematically and continuously physically assault and drag C.L. through the hallways in front of other children;" "[d]irecting the Principal to systematically and continuously physically assault and drag C.L. through the hallways in front of other children;" "[r]efusing to properly and timely implement an IEP;" "[s]uspending C.L. without proper cause to prevent him from obtaining an education;" and "fabricating false charges and engaging in [an] illegal Manifestation Determination hearing and illegal suspension." Am. Compl. ¶¶ 184(a)-(h), 193(a)-(i), 200(a)-(i), 208(a)-(i). As the Third Circuit held in *Batchelor*, "there is a logical path to be drawn from [Plaintiffs'] claims of retaliation to the District's failure to provide" C.L. with a FAPE. *Batchelor*, 759 F.3d at 274-75. Accordingly, these claims must proceed through the administrative process before this Court may assert jurisdiction.

Finally, exhaustion is also required with respect to Plaintiffs' Section 1983 claims in Counts VIII and IX.[9] In Count VIII, Plaintiffs claim that "Defendant's conduct in failing to provide C.L. with a free appropriate public education constitutes unlawful discrimination against the Plaintiff and other similarly situated disabled children in violation of the equal protection clause . . . ." *Id.* ¶ 217. Since this claim – like the IDEA, RA, and ADA claims – is based on Defendants' failure to provide a FAPE, it comes within the reach of the IDEA's exhaustion rule. *Roquet v. Kelly*, No. 4:11-CV-01763, 2013 WL 5570269, at *8 (M.D. Pa. Oct. 9, 2013)

---

9. Plaintiffs have attempted to assert claims for violations of the Pennsylvania Constitution through § 1983 in Counts VIII and IX. It is clear, though, that "[a]llegations of state law or state constitutional violations will not support a § 1983 claim." *Kuhns v. City of Allentown*, 636 F. Supp. 2d 418, 435 (E.D. Pa. 2009) (citations omitted). Thus, even if these claims were not required to be exhausted, this aspect of them would have to be dismissed for failure to state a claim.

(requiring exhaustion of equal protection claim "based on the school district defendant's alleged failure to provide [student] with a [FAPE]"). In Count IX, Plaintiffs allege a § 1983 claim for violations of substantive and procedural due process.[10] Specifically, Plaintiffs claim that "[t]he School district and School Board . . . took actions to systematically suspend C.L. and not provide any appropriate behavioral treatment or care." *Id.* ¶ 227. C.L. was allegedly harmed by "the School District's continuous suspension of C.L., as well as physical and psychological . . . threats." *Id.* ¶ 228. In addition, according to the Amended Complaint, Defendants' "acts and omissions created conditions in the school that cause severe negative educational and social effects to C.L., as well as physical harm, mental anguish, embarrassment, and harassment." *Id.* ¶ 229. It is further alleged that, *inter alia*, "[t]he School District and School Board acted with deliberate indifference to C.L. including, but not limited to, concealment of his removal from classes and isolation in rooms away from other children for significant periods of time," *id.* ¶ 230; "[i]t is an official policy, custom, and practice of the School District and School Board to violate a disabled child's federal rights, guaranteed by the IDEA," *id.* ¶ 231; "[t]he School District and School Board out of deliberate indifference to C.L. failed to implement any sort of

_____

10.      Plaintiffs have not specifically alleged what substantive due process right was violated by the Defendants' alleged conduct. It is possible that Plaintiffs intended to allege that C.L.'s substantive due process right to bodily integrity was infringed, as that phrase appears in a few paragraphs of the Amended Complaint. However, it is also possible that the claim is premised on violations of the IDEA, itself. *See, e.g.*, Am. Compl. ¶ 227 (alleging that the School District did "not provide any appropriate behavioral treatment or care"); *id.* ¶ 228 (alleging that C.L. was harmed by the continuous suspensions); *id.* ¶ 231 (alleging that the School District has a policy of violating students' IDEA rights); *id.* ¶ 232 (alleging that the School District "failed to implement any sort of reasonable behavioral plan that was authorized by trained professional psychologists and psychiatrists"). If that is the case, the claim is not viable no matter whether it has been exhausted, as the Court of Appeals has held that § 1983 may not be used to redress a child's IDEA-created rights. *See A.W. v. Jersey City Pub. Sch.*, 486 F.3d 791, 802-03 (3d Cir. 2007). Similarly, the basis of Plaintiffs' procedural due process claim is not clear from the Amended Complaint. To the extent that this claim is based only on violations of the IDEA, it is likewise not viable.

reasonable behavioral plan that was authorized by trained professional psychologists and psychiatrists," *id.* ¶ 232; and "[t]he School Board Members in bad faith directed the other Defendants to engage in actions to wrongfully expel C.L. and failed to even give a modicum of consideration of the true facts and evidence," *id.* ¶ 237. Just like Plaintiffs' other claims, Count IX raises issues that could be remedied by the IDEA's administrative process, so the exhaustion requirement applies.

### 3. Were the claims exhausted?

Since each of Plaintiffs' claims comes within the ambit of the IDEA, the Court must now determine whether these claims were actually exhausted. Plaintiffs claim that they were. In their view, a full record was developed at the expedited due process hearing, and "the central element of the [their] claims are the violations of the IDEA which the Due Process Hearing Officer already held were violated as a matter of law in her twenty (20) page decision." Pls.' Br. at 2, ECF No. 28. *Id.* Thus, they argue, "no further administrative hearing is necessary to resolve the issues before the Court." *Id.*

The Court cannot agree. Although Plaintiffs did appeal the School District's manifestation determination, "[i]t is well-established law that administrative exhaustion requirements apply to *each* claim a plaintiff seeks to bring before a district court." *S.S. by & through Street v. D.C.*, No. CV 14-344 (CKK), 2014 WL 5034619, --- F. Supp. 3d ----, at *3 (D.D.C. Oct. 9, 2014) (emphasis in original) (citing 20 U.S.C. § 1415(i)(2)(A); *Chambers*, 587 F.3d at 187 n.14; *Blackmon ex rel. Blackmon v. Springfield R–XII Sch. Dist.*, 198 F.3d 648, 655 (8th Cir. 1999)). This means that all "*allegations* . . . need to be raised before the IDEA hearing officer to the extent that they 'relate unmistakably to the evaluation and education placement of [the student] and 'could be redressed to any degree by the IDEA's administrative procedures and

remedies.'" *Id.* at *3 (emphasis in original) (quoting *M.T.V. v. DeKalb Cty. Sch. Dist.*, 446 F.3d 1153, 1159 (11th Cir. 2006); *Padilla v. Sch. Dist. No. 1 in the City and Cnty. of Denver, Co.*, 233 F.3d 1268, 1274 (10th Cir. 2000)); *see also Jeremy H.*, 95 F.3d at 284 (finding that issue that was not raised before hearing officer had "to be exhausted before it is examined in the district court"); *Blackmon*, 198 F.3d at 655 (explaining that a party must exhaust administrative remedies as to all of "the issues upon which she seeks judicial review").

In this case, there were only two issues before the hearing officer: (1) did the School District accurately determine that C.L.'s behavior was not a manifestation of his disabilities, and (2) was it appropriate for the School District to impose the same discipline on C.L. as it would have imposed on a non-IDEA-eligible student for a violation of the School District's code of conduct? Hr'g Officer's Decision 3. Thus, while Plaintiffs might be correct that they have "already exhausted administrative remedies with respect to [C.L.'s] placement," Pls.' Br. 11, they have not done so with respect to the litany of other allegations raised in the Amended Complaint. Indeed, contrary to Plaintiffs' argument, the "central element" of their 75-page Amended Complaint is not the violation of the IDEA found by the hearing officer. Rather, the gravamen of the allegations in the Amended Complaint relate to the alleged denial of FAPE or acts of alleged retaliation that occurred prior to Plaintiff's expulsion. None of these allegations were raised at the administrative level. However, "the plain language of the IDEA required [Plaintiffs] to file a separate administrative complaint" raising these allegations "and exhaust all administrative remedies regarding that complaint before filing a judicial action." *M.T.V.*, 446 F.3d at 1159. This would have given "educational professionals" the opportunity to take "the first crack at formulating a plan to overcome the consequences of educational shortfalls" and fashion appropriate relief. *Batchelor*, 759 F.3d at 276 (internal quotation marks omitted).

Accordingly, unless an exception applies, Plaintiffs' claims must be dismissed.

### 4.      Does an exception apply?

Plaintiffs argue that their claims are excused from the IDEA's exhaustion requirement because (a) further exhaustion would be futile; (b) they challenge the implementation, and not the content, of C.L.'s IEP; and (c) they seek monetary damages for prospective education at a private school and compensatory and punitive damages – none of which is available under the IDEA.[11] None of these exceptions are applicable here, however.

### a.      Futility Exception

Courts have applied the "futility exception where the plaintiff had previously exhausted administrative remedies, and where the factual record was sufficiently developed." *Batchelor*, 759 F.3d at 280. Several district courts in this circuit "have also expanded this rule to situations where the plaintiff sought remedies unavailable under the IDEA, *and* where the court was not presented with educational issues to be resolved." *Id.* (collecting cases) (emphasis added).

 In an attempt to bring their claims within this exception, Plaintiffs argue there are no other educational issues to be resolved because the hearing officer reviewed the entire record,

---

11.      Our Court of Appeals recently identified four separate situations where exhaustion is not required: "(1) exhaustion would be futile or inadequate; (2) the issue presented is purely a legal question; (3) the administrative agency cannot grant relief; and (4) exhaustion would cause severe or irreparable harm." *D.E. v. Cent. Dauphin Sch. Dist.*, 765 F.3d 260, 275 (3d Cir. 2014). However, the first, second, and third exceptions are often conflated. *See, e.g.*, *W.B. v. Matula*, 67 F.3d 484, 496 (3d Cir. 1995) (explaining that it has held "where the relief sought in a civil action is not available in an IDEA administrative proceeding, recourse to such proceedings would be futile and the exhaustion requirement is excused"); *Batchelor*, 759 F.3d at 280 (discussing scope of the futility exception as applied by district courts in this circuit) (internal citations omitted). In addition, although the Court of Appeals discussed the implementation exception in *Batchelor*, it recognized that "[t]here is no binding appellate precedent" applying it in this circuit. *Id.* at 278. Nonetheless, district courts in this circuit have recognized this exception, seemingly treating it as a subset of the futility exception. *See, e.g.*, *Derrick F.*, 586 F. Supp. 2d at 294 (explaining that "[e]xhaustion is generally futile where a plaintiff challenges a school district's failure to implement an IEP").

found that the School District violated the IDEA, and ordered the formulation of an IEP for C.L. The hearing officer's findings "are now the 'law of the case,'" and so there is nothing left for the hearing officer to do. Pls.' Br. 8.

Not so. As already explained, the hearing officer only considered two narrow issues, which related solely to whether the conduct for which C.L. was expelled was a manifestation of his disabilities and in turn whether his change of placement was proper. Now, however, Plaintiffs are attempting to raise claims about the provision of FAPE before Plaintiff's expulsion. True, the hearing officer heard evidence related to this period of time. But she did not consider the specific allegations Plaintiffs now raise and had no opportunity to consider whether such allegations amounted to a violation of the IDEA and, if so, how they could be remedied under the statute.

The hearing officer should be given this opportunity before the Court wades into this dispute, for the hearing officer has the ability to provide Plaintiffs with a remedy for the alleged harms to C.L. For example, if the hearing officer finds a violation or various violations of the IDEA, she could award compensatory education – which could include compensatory placement in a private school[12] – for the periods during which a FAPE was allegedly denied before C.L.'s expulsion. *See, e.g.*, *Draper v. Atlanta Indep. Sch. Sys.*, 518 F.3d 1275, 1286 (11th Cir. 2008)

_____

12. Plaintiffs submit that they do not request compensatory education, which they describe as "reimbursement for past education failures," but instead, request payment "future payment for private school," which they claim "is not available under the IDEA." Pls.' Br. at 13-14. This statement, however, is at odds with the very first paragraph of the Amended Complaint, which states that Plaintiffs do in fact seek compensatory education. *See* Am. Compl. ¶ 1. Similar statements appear elsewhere in the Amended Complaint. *Id.* ¶ 15 (noting that Plaintiffs seek "monetary damages in the nature of future compensatory education under the IDEA"). In addition, Plaintiffs do not cite any authority for the distinction they attempt to draw between compensatory education and payment for future private school tuition. The latter, it would seem, is merely a subset of the former, which could be awarded under certain circumstances by a hearing officer. *See, e.g.*, *Draper*, 518 F.3d at 1285. And, importantly, "the administrative hearing is a proper forum to resolve financial liability for the child's private educational program." *N.S. v. Com., Dep't of Educ.*, 875 F. Supp. 273, 275 (E.D. Pa. 1995).

("We do not read the Act as requiring compensatory awards of prospective education to be inferior to awards of reimbursement . . . . Although it ordinarily has a structural preference for special education in public schools, the Act does not foreclose a compensatory award of placement in a private school."); *Ferren C. v. School Dist. of Philadelphia*, 595 F. Supp. 2d 566, 577 (E.D. Pa. 2009), *aff'd*, 612 F.3d 712 (3d Cir. 2010) ("Courts have often awarded compensatory education in the form of tuition reimbursement or an injunction requiring school districts to pay for private school tuition or other services."). The hearing officer could also consider whether K.B. is entitled to a tuition reimbursement to cover the costs already expended in sending C.L. to private school, insofar as K.B. may have fronted the costs of C.L.'s private placement (which is not clear from the record). *See Batchelor*, 759 F.3d at 277 (explaining that "if parents have paid for a disabled child's education because the public schools were failing to provide a FAPE, the reimbursement of such expenses constitutes appropriate relief under the IDEA").

Accordingly, Plaintiffs are not correct that there is nothing to gain from further administrative proceedings. And in accordance with the policies underlying the IDEA, a state hearing officer – and not this Court – should decide in the first instance whether any of the relief afforded by the IDEA should be provided in this case.

### b.    Implementation Exception

Plaintiffs next contend that their claims are exempt from the IDEA's exhaustion requirement under the implementation exemption. As Plaintiffs argue, some courts have found that exhaustion is not required when a plaintiff is only challenging a school's failure to implement an IEP, as opposed to the content of the IEP. *See, e.g.*, *Derrick F.*, 586 F. Supp. 2d at 295. In this case, however, Plaintiffs do not claim that the School District failed to comply with

the terms of an already-existing IEP. Indeed, they could not make such a claim because the School District never developed an IEP for C.L., so there was nothing for the School District to implement.[13] Rather, as in *Batchelor*, where the Third Circuit refused to apply the implementation exception, Plaintiffs "here make substantive claims under the IDEA for failure to provide a FAPE, in addition to claims for retaliation." 759 F.3d at 280. Therefore, the implementation exception clearly does not apply.

### c. Monetary Damages Exception

Finally, Plaintiffs submit that they are excused from the exhaustion requirement because they do not seek remedies available under the IDEA, but instead seek monetary damages for the violations of the IDEA already found by the hearing officer. Plaintiffs are correct that part of the relief they seek – compensatory and punitive damages – is not available under the IDEA.[14] *Chambers*, 587 F.3d at 186. But, as the Court of Appeals recognized in *Batchelor*, that "is not dispositive, for several reasons." 759 F.3d at 276.

For starters, as in *Batchelor*, Plaintiffs here do not limit their requested relief to compensatory and punitive damages. *See id.* Rather, at various points in the Amended Complaint, Plaintiffs also request attorney's fees and costs, "other appropriate judicial relief," and compensatory education. Therefore, despite Plaintiffs' protestations to the contrary, the IDEA can provide at least some of the specific relief they seek.

More importantly, though, even if Plaintiffs had limited their requested relief to remedies

---

13.     Elsewhere in Plaintiffs' brief, they acknowledge that the gist of their claims is that the School District "failed to even initiate an IEP," thereby denying C.L. of a FAPE. Pls.' Br. 12. This directly calls their reliance on the so-called implementation exception into question: how could the School District fail to implement an IEP that it never initiated in the first place?

14.     In light of *Chambers*, Plaintiffs' request for compensatory and punitive damages with respect to their IDEA claim "fail[s], irrespective of exhaustion, as such damages are unavailable" under the statute. *Batchelor*, 759 F.3d at 277 n.13.

that are not available under the IDEA, that would still not allow them to skirt the exhaustion requirement. The remedies sought in a plaintiff's complaint "do not dictate the applicability of the IDEA to their claims." 759 F.3d at 277. Instead, "'the theory behind the grievance may activate the IDEA's process, even if the plaintiff wants a form of relief that the IDEA does not supply.'" *Id.* at 276 (quoting *Charlie F. v. Bd. of Educ. of Skokie Sch. Dist. 68*, 98 F.3d 989, 992 (7th Cir. 1996)).

Here, as the Court has already exhaustively explained in prior sections of this Memorandum Opinion, the thrust of Plaintiffs' grievance is that the School District failed in its obligations under the IDEA during C.L.'s brief period of enrollment at the start of the 2014-15 school year. They allege, among other things, that the School District purposefully delayed the formulation of an IEP for C.L., failed to comply with the least restrictive environment requirement, and retaliated against C.L. / created a hostile learning environment by locking him in a "safe" room, having him escorted around the School by a police escort, preventing K.B. from attending "necessary meetings," providing him with an aide with whom he did not get along, directing the principal to drag C.L. through the halls in front of fellow students, suspending him, and engaging in an illegal manifestation determination hearing and suspension. Among other injuries, Plaintiffs claim that C.L. was denied a FAPE, "and said injuries continue to interfere with his education and social activities." Am. Compl. ¶ 163. This is the quintessential form of educational harm that the IDEA was designed to address. *See Batchelor*, 759 F.3d at 278 (finding that the "genesis and manifestations" of the student's problems were educational where his parents claimed that "as a result of the District's bad behavior, which included its failure to provide [the student] with a FAPE, '[the student] has suffered great harm to his educational achievement'") (internal citation and quotation marks omitted); *E.K. v. River Dell Reg'l Sch.*

*Dist. Bd. of Educ.*, No. 11-CV-00687 CCC, 2015 WL 1421616, at *5 (D.N.J. Mar. 26, 2015) ("Deficiencies in the provision of a free appropriate public education are the very grievances upon which the IDEA'S administrative process was built to address.").

The nature of the injuries claimed by C.L. readily distinguishes this case from *M.C.*, 2015 WL 2231915, the primary case on which Plaintiffs rely. In *M.C.*, the student's parents alleged that she was sexually assaulted on a school bus by a fellow student and brought claims under, *inter alia*, the RA and ADA against the School District and others seeking compensatory and punitive damages. *Id.* at *1-3. Contrasting the student's claims with the claims in *Batchelor*, the court found that they were "not educational in nature but are more akin to a personal injury claim incapable of remedy by the IDEA administrative process." *Id.* at *6. Importantly, the court reasoned, the student did not suffer "any 'educational shortfalls' that could be remedied by educational professionals in the IDEA process." *Id.* On the contrary, she claimed that she suffered anxiety as a result of the alleged sexual abuse, manifested by "trouble sleeping, bouts of crying, nightmares, feeling guilt and shame regarding the abuse, wetting the bed at night, and feeling helpless in light of the terrible incident she endured." *Id.* at *7. Further distinguishing her claim from that in *Batchelor*, the student "admitted that she did not suffer educationally . . . and did not require adjustment of her IEP or educational placement." *Id.* By contrast, in this case, Plaintiffs expressly allege that C.L. was denied a FAPE and that the School District's alleged conduct has interfered with his education. Am. Compl. ¶ 163 (alleging that C.L.'s "injuries continue to interfere with his education"). Such "educational shortfalls" can be remedied through the IDEA's administrative process. *Batchelor*, 759 F.3d at 276.

Plaintiffs' citation to *McCachren v. Blacklick Valley School District*, 217 F. Supp. 2d 594 (W.D. Pa. 2002), is likewise not persuasive. Yet while the court in *McCachren* did hold that the

plaintiffs were excused from the exhaustion requirement because they only sought compensatory and punitive damages under § 1983 for violations of their IDEA rights, this holding is suspect in the wake of *Batchelor*. No longer can a plaintiff circumvent the IDEA's exhaustion requirement by limiting its requested relief to compensatory and punitive damages. *See A.D.*, 2015 WL 892643, at *14 (D.N.J. Mar. 2, 2015) (explaining that after *Batchelor*, a plaintiff cannot "'sidestep the exhaustion requirements of IDEA,' by seeking monetary damages") (quoting *Polera v. Bd. of Educ. of Newburgh Enlarged City Sch. Dist.*, 288 F.3d 478, 488 (2d Cir. 2002)). The focus of the inquiry is instead on whether the substance of the grievance could be addressed through the administrative process. In this case, for the reasons hereinabove stated, it could be.

In sum, Plaintiffs' IDEA, RA, ADA, and Section 1983 claims are each subject to the IDEA's exhaustion requirement. Since Plaintiffs did not raise these claims at the administrative level, and since Plaintiffs have failed to establish the applicability of any of the exceptions to the exhaustion requirement, these claims will be dismissed for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1), albeit without prejudice.[15] After the alleged "educational deficiencies have been addressed" through the IDEA's administrative process, Plaintiffs "may seek further remedy in court pursuant to statutory schemes allowing for compensatory and punitive damages, such as Section 504 and the ADA provide." *Batchelor*, 758 F.3d at 278.

## B. State Law Claims

Having determined that Plaintiffs' federal claims must be dismissed for lack of subject matter jurisdiction, the Court will decline to exercise supplemental jurisdiction over their state

---

15. Since the Court will dismiss the entire Amended Complaint for failure to exhaust administrative remedies, the Court need not address the individual Defendants' two additional arguments in support of dismissal of Plaintiffs' claims against them: that the official-capacity claims against them are duplicative of the claims against the School District; and that they are entitled to qualified immunity.

law claims. *See* 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction . . . [if] the district court has dismissed all claims over which it has original jurisdiction."); *Byrd v. Shannon*, 715 F.3d 117, 128 (3d Cir. 2014) (affirming dismissal of state law claims where district court dismissed all of the plaintiff's federal claims).

## IV.     Conclusion

For the foregoing reasons, Defendants' motion to dismiss will be **GRANTED**, and Plaintiffs' Amended Complaint will be **DISMISSED** in its entirety without prejudice. An appropriate order follows.

McVerry, S.J.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **C.L.**, *by and through his parent and natural guardian, K.B.*, | ) ) ) |
| **Plaintiffs,** | ) **2:14-cv-1666** |
| | ) |
| **v.** | ) |
| | ) |
| **MARS AREA SCHOOL DISTRICT, ADAM M. KOSTEWICZ, DR. WILLIAM J. PETTIGREW, J. DAYLE FERGUSON, REBECCA BROWN, GORDON MARBURGER, STEVEN B. BOGGS, RITA DORSCH, JANE DUNN, JOHN KENNEDY, CHRISTINE VELENTA and BONNIE L. WEAVER,** | ) ) ) ) ) ) ) ) ) |
| **Defendants.** | ) |

### ORDER

**AND NOW**, this 30th day of June, 2015, in accordance with the foregoing Memorandum Opinion, it is hereby **ORDERED**, **ADJUDGED**, and **DECREED** that Defendants' MOTION TO DISMISS AMENDED COMPLAINT IN CIVIL ACTION PURSUANT TO RULE 12(b)(1) AND 12(b)(6) (ECF No. 25) is **GRANTED**, and Plaintiffs' Amended Complaint is **DISMISSED** in its entirety without prejudice. The Clerk shall docket this case **CLOSED**.

BY THE COURT:

s/ Terrence F. McVerry
Senior United States District Judge

cc: **John P. Corcoran , Jr., Esq.**
Email: jpc@jgcg.com

**Thomas E. Breth, Esq.**
Email: tbreth@dmkcg.com

(via CM/ECF)